RITCHIE et al. v. SAYERS et al.

(Circuit Court, D. West Virginia. February 24, 1900.)

1. ATTACHMENT—STATUTORY PROCEEDINGS.
    An attachment proceeding in a state court under the West Virginia law, when there is only constructive service of process by publication, and no appearance by the defendant, is strictly a statutory remedy, and in derogation of the rights of the party at common law; and in order to deprive a person of his common-law rights, and make the judgment or decree rendered in such proceedings valid and binding, the requirements of the statute must be strictly complied with.

2. SAME—SALE OF REALTY—BOND—WANT OF JURISDICTION.
    Where the statute expressly provides "that no sale of real estate attached shall be made until the plaintiff, or some one for him, shall give bond with sufficient security, in such penalty as the court shall approve, with conditions," etc. (Code W. Va. 1868, c. 106, § 23), a sale of real estate without such bond being given or required to be given will not only be made without authority from the statute, but against the express and positive command of it, and will confer no title upon the purchaser.

3. JUDGMENT—COLLATERAL ATTACK.
    Although a court may have jurisdiction of a case, yet, if it appears from the record that it did not have jurisdiction to enter the decree and the particular judgment thereon that it did enter, then that decree and judgment may be collaterally impeached.

4. NOTICE TO PURCHASERS.
    Persons claiming title under a purchaser whose title is derived from a decree entered by a court without jurisdiction to enter such a decree are affected with notice of such invalidity of title in their vendor, such invalidity appearing of record and in their chain of title, and such derivative purchasers are proper parties to a bill attacking the decree and the deed made under it.

5. VOID TAX DEEDS.
    The decision of this court in De Forest v. Thompson, 40 Fed. 375, that a tax deed, made prior to the curative statute of 1882, under a sale in which the requirements of the statute were not complied with, is void, is adhered to and reaffirmed.

6. EQUITY—LACHES.
    There can be no laches in failing to assert rights of which a party is wholly ignorant, and whose existence he had no reason to apprehend.

7. SAME.
    Except in peculiar cases, the facts of which require a departure from the usual rule, a court of equity will not hold a party guilty of laches within the period that the statute of limitations would not defeat a recovery of land upon the legal title.

8. SAME—JURISDICTION.
    Where the invalidity of a tax deed, or a deed under a decree of a court acting without jurisdiction, does not appear on the face of the deed, such invalidity must be made to appear by facts dehors the deed itself; a common-law action does not afford the full and adequate remedy which should be given, and a court of equity has jurisdiction of a suit to impeach and annul such a deed.

9. SAME—PLEADING—MULTIPLICITY.
    A bill may be framed with a double aspect, and pray for relief in the alternative, where the statements of fact are not inconsistent; and a demurrer to such a bill, praying for relief in the alternative, and which shows that the plaintiff is entitled to one kind of relief or another, should not be sustained for multiplicity.

(Syllabus by the Court.)

In Equity.

Flournoy, Price & Smith, for plaintiffs.
Simms & Enslow and Chapman & Gillespie, for defendants.

JACKSON, District Judge. This case is now being heard upon a demurrer to the bill. It is alleged that the commonwealth of Virginia issued its patent, dated on the 29th day of April, 1795, granting Wilson Cary Nicholas a tract of land containing 300,000 acres, lying in the counties of Wythe and Russell. In 1799 the county of Tazewell was formed from the counties of Wythe and Russell. In 1858 the county of McDowell was formed from the county of Tazewell. After the formation of these new counties, the greater part of the 300,000-acre tract was embraced by the boundaries of the county of McDowell, leaving the remainder lying in the county of Tazewell, Va. The bill alleges: That the tract of land was returned delinquent in Tazewell county, Va., for the non-payment of taxes thereon, in the name of Wilson Cary Nicholas, and under an order of the county court of said county made on the ———— day of ————, 185–, 50,000 acres of the said tract was laid off and surveyed by commissioners for that purpose, and sold for taxes, which was purchased by Kiah Harman, Harvey George, and H. A. Harman. On the 29th day of September, 1853, Samuel L. Graham, clerk of the county court of Tazewell county, conveyed the land by deed to the purchasers, which is recorded in the clerk's office. The bill further alleges: That subsequently, by sundry conveyances from the purchasers and their heirs at law and devisees, the title of the land vested in one James S. French. That on the 27th day of March, 1871, French conveyed to the plaintiffs, by deeds duly recorded, the tract of 50,000 acres of land, with covenants of general warranty. That on the ———— day of ————, 1871, the plaintiffs conveyed undivided portions of the tract of land, as follows: First, to Alexander McConnell 1,100 acres, common and undivided, being a portion of the 40,000 acres, which was a portion of the 300,000 acres, but, as is alleged in the bill, the 40,000 acres was bounded and described by the same boundaries that bounded and described the 50,000-acre tract; second, to Albert Rinear 1,100 acres, common and undivided, being a portion of the 40,000 acres, which was a part of the 300,000 acres, the boundaries being the same as the 50,000-acre tract; third, to Benjamin D. Wright an undivided one-tenth interest in 40,000 acres in the land owned by Sperry and Ritchie, the boundaries of the 40,000 acres being the same as the 50,000-acre tract. The bill further alleges that McConnell, Rinear, and Wright held undivided interests in 50,000 acres, and were and continued to be tenants in common with your orators, and all persons claiming interests in said lands under your orators, and that, by reason of the co-tenancy existing between the parties, McConnell and Rinear had the right to have laid off and assigned to each of them 1,100 acres of the said 50,000 acres free of all adverse claims, and the said Benjamin D. Wright the right and title to one undivided tenth of the whole 50,000 acres. And it is further alleged that on the 5th day of December, 1877, Daniel H. Harman, acting for the benefit of David G. Sayers, a defend-

ant in this suit, sued out of the circuit court clerk's office of Mc-Dowell county, W. Va., an order of attachment against I. P. Sperry and S. J. Ritchie (the plaintiffs), and W. Sperry, partners under the firm name of Sperry, Ritchie & Co., as defendants, which attachment commanded the sheriff to attach the unsold portion of the 50,000-acre tract, belonging to the defendants, lying in said county, on both sides of Dry Fork of Sandy river, conveyed by Thomas S. French and wife to the defendants (now the plaintiffs in this action), which unsold portion contained 37,000 acres, or a sufficient quantity thereof to pay $270.21, with interest on $268.71, part thereof, from the 28th day of March, 1877, until paid, and the remainder without interest, and the costs of the suit, and make return of his proceedings under this order to the next term of the circuit court of McDowell county. The attachment was levied the same day upon the unsold portion of the 50,000 acres, supposed to be 37,000 acres. At February rules, 1878, an order of publication was awarded, stating that the object of the suit was to attach and subject to sale the unsold portion of the tract of 50,000 acres of land of the defendants lying in the county of McDowell, W. Va., on both sides of the Dry Fork of Sandy river, conveyed to them by James S. French and wife, which unsold portion was about 37,000 acres. A lis pendens was also recorded in said county, stating the object of the suit. The bill charges that the plaintiff Harman, acting for Sayers, at the January rules, 1878, filed a bill praying that the unsold portion of the 50,000-acre tract be sold to satisfy plaintiff's debt, costs, etc. The bill further alleges that on the —— day of May, 1878, a decree was entered reciting the various steps in the proceedings that were taken up to that date, which adjudged that the plaintiffs in that action had a lien by reason of the attachment sued out in the proceedings, and decreed that the defendants (the plaintiffs in this action) pay to the plaintiffs in that action the sum of $303.91, with interest from date and the costs of the suit, and, upon the failure of the defendants to pay within 30 days the sum so decreed, that Henry Harrison, who was appointed a special commissioner, should sell the land in the bill mentioned on a credit of 6 and 12 months, except as to costs of suit and expenses of selling, for which cash might be required, taking from the purchaser bond, with good personal security, for the deferred installments. A further charge in the bill is that the defendants in that suit were not served with process, nor with a copy of the attachment, nor did they ever appear to defend the action. It is also alleged that the plaintiffs did not in that suit give a bond with security, as required by section 23 of chapter 106 of the Code of West Virginia of 1868, with conditions required by the statute. It is further alleged that no bond was given, as required by law, before the commissioner advertised the land described in his advertisement as "a certain tract or parcel of land in the bill and proceedings mentioned, lying on the Dry Fork and its tributaries, waters of Tug river, and near McDowell court house," and stating the number of acres as 37,000 acres of valuable land in McDowell county; that at the October term, 1878, the commis-

sioner reported that on the 3d of September, 1878, he sold the tract of land in the bill and proceedings mentioned to the plaintiff D. G. Sayers, at the sum of $365.61, which, after deducting the costs of suit and expenses of sale, left $308, which was in full of the plaintiff's decree in the cause, and that no bond was taken from the plaintiff, who was the purchaser. On the 14th day of October, 1878, a decree was entered confirming the sale to the purchaser, and directing the commissioner to convey the tract of land in the bill and proceedings mentioned. It is further alleged that on the 14th day of May, 1878, another and supplemental decree was entered, showing payment of money, and again directing the commissioner to convey said land to the said D. G. Sayers, with special warranty of title. The plaintiffs further aver that they never did appear in said cause, and, in fact, had no knowledge of the pendency of such a suit until long after the last-mentioned decree was entered and said suit had been retired from the docket; and at the time the last decree was entered and the suit retired from the docket the right of the defendants to appear and make defense to it, as prescribed in section 23, c. 106, Code W. Va. 1868, had not expired by limitation or otherwise. It is further alleged that the plaintiffs having failed to give the bond required by section 23, c. 106, Code W. Va. 1868, renders the sale invalid and illegal, and without authority of law, and is in direct conflict with the expressed prohibition of the statute, and did not devest the plaintiffs of their title, nor did the title to the land pass by the sale made in pursuance thereof to the defendant D. G. Sayers, or to any subsequent purchaser claiming through or under him, and they could not be and were not bona fide purchasers without notice. It is further alleged that, in pursuance of the decrees of the 14th of May and 4th of October, 1878, the special commissioner conveyed the land sold by him, and in his conveyances described it to be "the following real estate, situate in the county of Tazewell, Virginia, and McDowell county, West Virginia, the greater part being the same land conveyed to I. P. Sperry and S. J. Ritchie by James S. French and wife, by deed bearing date the 27th day of March, 1871, being a portion of the three hundred thousand acres granted to William C. Nicholas, and conveying fifty thousand acres thereof, subject, however, to a reservation of six thousand acres heretofore conveyed by Sperry and Ritchie, eleven hundred acres of which was conveyed to Albert Rinear, eleven hundred acres to McConnell, and four thousand acres to Benjamin D. Wright." The bill also alleges that the land previously conveyed to Rinear, McConnell, and Wright was not sold, or attempted to be sold, and no title whatever under the proceedings conveyed the land of Rinear, McConnell, and Wright to Sayers, or to any purchaser or purchasers claiming under him, and that whatever interest Sayers obtained from the purchaser of the 50,000 acres at the tax sale was an undivided interest in said land, for the reason that Rinear, McConnell, and Wright were tenants in common with the rightful owners of the 50,000-acre tract, and that all the acts and doings of any one of the tenants in common inured to their benefit, to the

preservation of their title. It also appears from the bill that, by proper conveyances, Rinear and wife and McConnell and wife reconveyed their interest in the lands to the plaintiffs, purchased previously from them, and that by reason of such conveyances, in the event the court should hold that D. G. Sayers had acquired title to a portion of the 50,000 acres under the chancery proceedings heretofore referred to, then the said Sayers became a tenant in common with Sperry, Ritchie, and Wright in the 50,000 acres, to their respective interests. It is further alleged that Benjamin D. Wright died in 1894 (at which time he was a citizen and inhabitant of the state of Ohio), seised with an undivided one-tenth interest of 40,000 acres conveyed to him as aforesaid, leaving a will by which he devised the said interest to his wife, she being his sole devisee and also his sole executrix, which will was duly probated in the year 1894, in the probate court of Summit county, in the state of Ohio, a duly-authenticated copy of which was admitted to probate in the county court clerk's office of McDowell county, W. Va., on the 12th day of February, 1897; that on the 12th day of February, 1897, Nancy Wright conveyed to the plaintiffs the undivided one-tenth of said land, which had been previously conveyed to Benjamin D. Wright in his lifetime. The bill further alleges that after the said Sayers had purchased the unsold portion of the 50,000 acres at a tax sale made by Daniel H. Harman, deputy for A. J. Beavers, sheriff of McDowell county, on the 4th day of November, 1879, as delinquent for taxes, in the name of I. P. Sperry and Samuel J. Ritchie (the plaintiffs), Alexander McConnell, A. R. Rinear, and —— Wright, that J. F. Johnson, clerk of the county court of McDowell county, undertook to convey said 50,000 acres to the said Sayers by deed dated the 30th day of August, 1881, and admitted to record in the county court clerk's office of McDowell county on the 12th day of September, 1881. The bill charges that the tax sale made by the sheriff of the 50,000 acres, and the conveyance of the same by the clerk to Sayers, was null and void—First, because the list and report of the said sale was not returned to the office of the clerk of the county court of McDowell county within 10 days after the completion of the sale of said land, or of any other lands mentioned in said list and report, as required by law, and that there never was and is now no note or record in said county clerk's office showing the time said list and report were returned to said office, and because of other irregularities and omissions apparent upon the face of the report and list of sale; second, because, at the time of said sale and purchase, Sayers claimed to be a tenant in common in said land with the plaintiffs and said Wright, and therefore did not become the purchaser of the land in his own right, but, as plaintiffs submit and aver, said pretended purchase, if it had any effect in law, was nothing more than a redemption and payment of the taxes on said land, and that the redemption and payment of taxes, in law, was a redemption for the benefit of the plaintiffs and other owners thereof, and for this reason the deed of the clerk of the county court to him could not and did not pass to and vest in him

any right or title whatsoever, but the same was altogether null and void. It is further alleged that the plaintiffs had no knowledge of the pendency of the chancery suit, nor of the sale made under the decree entered in it, nor of the sale of the lands for taxes in 1879, and of the conveyance by the clerk to Sayers of said land in pursuance of said tax sale, until many years after it was sold, and not till within less than 10 years next preceding the filing of this bill; that the plaintiffs resided in the state of Ohio, and were not familiar with the methods in vogue in the southwestern counties of the state of West Virginia, and had no reason to believe, and did not believe, that they were in danger of losing their real estate through the manipulations of the officials, under the laws of the state. It is further alleged that the claim sued on by D. H. Harman in the chancery suit was a draft or check given for the payment of taxes on said land; that a check had already been sent him, which was collected, and the plaintiffs believe, and did believe, that said check, which was collected, paid the said taxes, and that the check sued on, after the first check had been collected, was sent through mistake by a member of the firm, who was ignorant of the fact that the first check had been sent by another member of the firm. The plaintiffs aver that they did not owe Daniel H. Harman anything whatever when said suit was instituted by him; and, believing that the taxes had already been paid, they had no reason to suppose that any action could be instituted against them, and for this reason they had no occasion to watch the records of the courts of McDowell county in regard to any suits against them. It is further alleged that a conspiracy and combination was entered into by and between the said Daniel H. Harman, David G. Sayers, and Henry Harrison to defraud the plaintiffs of their land by the institution of the chancery suit, and the attachment therein, on an unjust claim, and that it was agreed by the three parties that said land should be attached and sold and purchased by the said D. G. Sayers for the benefit of Harman, Harrison, and himself, and that Sayers, being the son-in-law of Harman, should receive and hold the title thereto for the joint benefit of himself and Harman for one half, and for the said Henry Harrison for the other half; that at the time of the institution of the suit, and for some time prior thereto, Sayers and Harrison had been engaged in the joint purchases of land in the immediate vicinity of the said 50,000 acres, and of some tracts probably within its bounds, the titles to all of which were vested in the said D. G. Sayers as the sole and ostensible owner, but in reality for the benefit of himself, Harman, and Harrison; that the plaintiffs did not learn of said conspiracy and combination until the summer of 1896, when the plaintiff S. J. Ritchie for the first time obtained information which led him to suspect the conspiracy, and since that time prompt and diligent steps have been taken by the plaintiffs, with the aid of counsel, by investigating the records of McDowell county and by other means, to ascertain the facts by which the existence of such a conspiracy and combination could be proven. And the bill charges that when Henry Harrison acted

as commissioner, making the sale in the suit mentioned, and conveying said land to the said D. G. Sayers, that he was interested in said sale as a purchaser with the said Sayers, and made said sale with the understanding and agreement with Harman and Sayers that he (Harrison) was to be the owner of one-half of the said land sold, and that the title to the land should be vested in said Sayers, in trust for Harrison, Harman, and Sayers. It is further alleged that the purchase of the 50,000 acres of land at the delinquent sale in November, 1879, by Sayers, was with the understanding and agreement between Harman and Harrison that the said purchase should be for their joint benefit, and that the title acquired by said sale should be held by the said Sayers, in his name, as the ostensible owner thereof, but really for himself, Harman, and Harrison, as the beneficial owners thereof, and that the deed made in pursuance of such sale was null and void, and that the title of the plaintiffs did not pass, nor was it vested in said Sayers, or any one else, by virtue of said sale, and that it afterwards appeared that a number of deeds were made for parcels of the 50,000 acres in the lifetime of the said Henry Harrison, who united as grantor with the said Sayers, and that after the death of the said Harrison portions of the land remained unsold, and were attempted to be partitioned between the heirs at law of said Henry Harrison and the said Sayers, one half to the said Harrison's heirs, and the other half to the said Sayers, and that said Sayers, in a suit for partition, admitted Harrison's interest in the land, although there was no deed of record from Sayers to Harrison. The bill further alleges that the said Sayers made 38 deeds, conveying portions of the 50,000 acres of land to sundry and divers persons, defendants in this action. It is alleged that in the years 1888 and 1889 W. A. Whitley and others, some of the heirs at law of the said Henry Harrison, deceased, instituted a suit against David G. Sayers and certain other heirs, to partition the 50,000 acres between Henry Harrison's heirs and David G. Sayers, in which suit said Sayers admitted that Henry Harrison, in his lifetime, was entitled to, and was the real owner of, an undivided one-half of said land, and that under a decree made in said cause in May, 1889, commissioners were appointed to lay off and assign to Henry Harrison's heirs, in severalty, one-half of said lands, and to Sayers one-half of the same; that the said assignment was duly made and reported, and confirmed by decree made in the suit on the 5th day of July, 1889, and that in pursuance of the said decree there was assigned to Henry Harrison's heirs, in 13 different parcels, about 7,200 acres of land; and that in 13 different parcels there was assigned to Sayers about 8,800 acres of land, all of which, it is alleged, was part and parcel of the 50,000 acres of land bought at the tax sale. It is further alleged that sundry and divers conveyances were made of portions of this land to other parties, which it is not necessary for the court to notice at this time. It is charged that at the time this partition was made the boundaries of the 50,000 acres contained more than that number of acres, and probably about 75,000 acres; that the tract of land was at that time, and

at the time of the bringing of this suit, mostly wild, uncultivated land, and was not in the open and actual possession of any person; that neither the defendant Sayers, nor Harrison or his heirs, ever took or held any actual possession of the 50,000 acres under the sales made thereof in the chancery suit in 1878, or under the sales made by the sheriff in 1879; and it is further charged that none of such purchasers ever took actual or open possession of the portions of the land purchased by them, and that none of said purchasers have been in the actual, visible, and continuous possession of the portions of the land so purchased by them, respectively, for the period of 10 years. There are other allegations in the bill, which the court deems it immaterial to notice upon a demurrer to the bill.

Upon the allegations of the bill, the court is asked that the various sales and conveyances made, both under the attachment proceedings and the tax sale, be set aside, and declared null and void, and that the clouds resting upon the plaintiffs' title by reason thereof be removed, and that, in the event the court is of opinion that the defendants Sayers or Harrison's heirs are entitled to any portion of this land, the court will decree a partition as to the undivided interest and share in the lands which passed to and vested in the plaintiffs under the deeds from McConnell, Rinear, and Wright, and to have their portion laid off and assigned to them. The further prayer of the bill is that, in the event the court should be of opinion that the plaintiffs could not recover the lands conveyed by Sayers and Harrison to other persons, then, inasmuch as they have realized large sums of money from the lands so sold and conveyed, they should be required to account to the plaintiffs in this action for the moneys so received. The further prayer of the bill is that the sale and conveyance made under the chancery suit in 1878, as well as the pretended sale for taxes made in 1879, and the conveyance made to D. G. Sayers in 1881, may be declared null and void, and the deeds set aside and annulled, and that all the deeds made by Sayers and Harrison be set aside and annulled, and that the clouds resting upon the plaintiffs' title by reason of any of the deeds mentioned in the prayer of the bill be removed, and the plaintiffs' title cleared of such clouds, and that, if for any reason the court is of opinion that the deeds to Sayers cannot be set aside and annulled, the plaintiffs may be decreed to be entitled to have a partition of said 50,000 acres vested in said Sayers, or in Henry Harrison's heirs at law, and may also have their undivided interests which passed to them under the deeds from Rinear, McConnell, and Wright, hereinbefore mentioned, decreed and laid off and assigned to them; and, if for any reason the court is of opinion that the deeds made by Sayers and Harrison to the other persons cannot be set aside and annulled, then that the plaintiffs may be declared and decreed to be entitled to have partition with said other persons, and to have an undivided interest and share in said portions of the land which passed to and vested in them under the deeds from Rinear, McConnell, and Wright, as aforesaid; and a prayer for general relief.

In the statement I have made of the bill, and the allegations con-

tained in it, the court has endeavored, to some extent, to extract from the bill the material matters contained in it; or, in other words, to state as briefly as possible its material allegations. The bill is a very long one, though I cannot say that, considering all the questions that are raised by it, the pleader could have curtailed its length. To this bill a demurrer is interposed by the defendants. In presenting the demurrer there is, to some extent, an effort upon the part of the defendants to argue questions of fact rather than the law arising upon the bill.

The first ground of demurrer is that the plaintiffs have a full, adequate, and complete remedy at law. This bill is filed chiefly for the purpose of setting aside a deed made under and by virtue of the authority of the circuit court of McDowell county, and also to set aside a tax deed made by Johnson, clerk of the county court of McDowell county, for the land described in the bill. The ground for asking that these deeds be set aside is fraud in obtaining the decree of the court which resulted in selling the land of the plaintiffs, and also for the fraudulent sale of the 50,000 acres at the tax sale.

We will first notice the sale under the decree of the court. It is alleged that an attachment was sued out by D. H. Harman, whose relation to the plaintiffs, in law, seemed to be that of an agent; for he had received a check, which he had collected, for the purpose of paying taxes on the 50,000 acres, which he failed to apply. It is also alleged that a second check was given him by mistake, and that instead of returning it as a faithful agent should have done, when it was protested, he instituted an action upon it, sued out an attachment, and levied it upon the plaintiffs' lands, and obtained a decree directing the lands to be sold, and had a man appointed as commissioner to make sale of the lands, who, the bill alleges, was interested with him in the purchase of the lands, and that a conspiracy was entered into between Harman and Harrison, who was the commissioner appointed to sell, and Sayers, who was the purchaser, in reference to the sale of these lands, apparently at both the judicial and the tax sales. Questions of this character, involving fraud, cannot well be disposed of in a proceeding at law, but are properly cognizable in a court of equity, where the conscience of the parties can be appealed to and called upon to disclose all their acts in connection with the sale and purchase of the land in controversy. The demurrer admits that the plaintiffs in this action were the owners of the land before the judicial proceedings were commenced and before the tax sale. While it is not distinctly alleged that Harman was the agent of the plaintiffs, it is alleged that a check for money was sent to him for the purpose of paying the taxes upon the lands, and that he accepted the trust and collected the money, occupying a sort of fiduciary relation to the plaintiffs in this action, but the proceeds of which check he did not apply to the purpose for which it was sent, for the lands were subsequently sold for taxes. But not only is this so. Instead of notifying the plaintiffs in this action that he had received the money and applied it, when the second check—which was sent to him by mistake—came and was protested, instead of calling upon the plaintiffs, as he should

have done, to learn why the check was protested, it appears from the allegations of the bill that he took steps to obtain a judgment upon a claim based upon this check, to which he had no legal or equitable right. This is a fair deduction from the allegations of the bill. From this the court must infer an intent and purpose upon his part to fraudulently sell and dispose of these lands. It is apparent from the bill that his purpose did not stop with obtaining a decree in a court of equity against the land, but it was carried out and executed by letting the lands be sold for taxes, and failing to use the money that he had collected upon the plaintiffs' check sent for the payment of the taxes on the lands. The allegations of the bill show that after these proceedings were had these lands were partitioned and divided up between the defendant Sayers, who was the purchaser, and Harman and Harrison. There can be no legal remedy at law for such action. The remedy is by a bill in equity.

But it is claimed that the circuit court of McDowell county had full and complete jurisdiction over this matter, and that, that jurisdiction being exercised, it cannot be collaterally attacked. A court has jurisdiction over a person when it has the person before the court upon its processes duly served, or it has jurisdiction over any estate of the person, under our statute, when he is a nonresident, by attaching it under the statute when the proceedings fully comply with the terms of the statute. In this case there was an attempt to sue out an attachment, not in accordance with the terms and provisions of the statute, but strictly in defiance of the statute. Can it be said that, when a court undertakes to exercise jurisdiction over the property of a nonresident, it can sequester his property, and dispose of it, without service of process upon him, or without pursuing the statute strictly that gives a court the right to exercise its jurisdiction in the absence of process, duly executed? In this case the attachment that was sued out was for a very small debt—less than $300—against a tract of land of great value, supposed to contain an area of 50,000 acres. No bond was given, as required by the statute, before the sale was made. The proceedings had under the statute were in derogation of the rights of the party at common law, and it is a well settled and familiar principle that, where a proceeding is founded upon a statute which deprives a party of his common-law rights, every condition or requirement of the statute must be fulfilled and strictly complied with. What protection has a nonresident who owns real estate in our state, if he has no notice of a suit that may be brought against him, and if his property is proceeded against for the purpose of collecting either a rightful or an illegal claim, unless the conditions which are precedent to the exercising of these powers which confer jurisdiction upon the courts are complied with? The courts all hold that, where proceedings are instituted under statutes of this character, a failure to comply with the provisions of the statute should be condemned, and the sale of property under such circumstances should be set aside. The statute expressly provides "that no sale of real estate, attached, shall be made until the plaintiff, or some one for him, shall give bond, with sufficient security, in such penalty as the court shall approve, with

100 F.—34

conditions," etc.; "provided that after the .right of a defendant to appear and make defense in any such action or suit expires by limitation, or otherwise, as prescribed in this chapter, a sale of such real estate may be made under a judgment, order or decree, whether such bond has been given or not." The bill in this instance expressly alleges that no such bond was ever given, and that the sale was made before the time expired that gave the plaintiffs in this action, who were nonresident defendants in the attachment proceeding, the right to appear and make defense. It alleges that the decree of sale was entered at the May term, 1878, and that the sale was made on the 3d of September, 1878, and confirmed on the 14th day of October, 1878, and a deed was actually made by Harrison on the 9th day of July, 1879. This whole proceeding was illegal and void, commencing with the decree of sale, for the reason that such sale was absolutely prohibited until bond was given. In support of this position, I cite the able opinion .of Judge Snyder in the case of Hall v. Lowther, 22 W. Va. 577, in which he says that:

"It is apparent from these provisions that the legislature, in the enactment of this statute and authorizing the sale of property of an absent defendant by ex parte proceedings, was fully aware of the great injustice that might be done to the defendant by an abuse or oppressive use of such proceedings, and it therefore used great precaution in placing upon them every reasonable restriction and limitation it was possible to do, to prevent such abuse, and such as would effectually guard and protect both the rights of the defendant and the bona fide purchaser in such cases. In order to secure indemnity to the defendant and to protect the title of the purchaser, it expressly declared that the plaintiff should not have the benefit of the provision authorizing the sale of the property unless and until he shall have given bond with security to answer any future order made in the case. This was intended to secure the defendant against any damage that might be done him by the wrongful employment or abuse of the provisions of the statute, without the necessity of resorting to the property sold. It was also intended that this bond, by thus securing indemnity to the defendant, should protect the title of the purchaser of the property; for in case such bond was given, and the purchase was bona fide, the defendant is confined to his remedy on the bond, and cannot question or impeach the title of the property so purchased. But in order to make this indemnity and redress to the defendant effectual, and protect the title of the purchaser, the statute made it a condition precedent that before any sale could be made the plaintiff should give such bond. Until such bond is given, the statute does not authorize the sale to take place. It also provides that the penalty of the bond shall be such 'as the court shall approve'; thereby making it necessary for the court, by its order or decree entered of record in the suit, as its orders can only appear by its records, to fix the penalty of the bond. Unless and until such order is made fixing the penalty and the bond actually given, no sale can be made under the provisions of the statute; and, if a sale is made without such bond, such sale will not only be made without authority from the statute, but against the express and positive command of it. A sale thus made, in violation of and not under the statute, can confer no title upon the purchaser."

It has been repeatedly held that a judgment of a court of competent jurisdiction, rendered without authority of law, is a nullity. ·City of Charleston v. Beller, 45 W. Va. 44, 30 S. E. 152; Norfolk & W. Ry. Co. v. Pinnacle Coal Co., 44 W. Va. 574, 30 S. E. 196, 41 L. R. A. 414; Wilkinson v. Hoke, 39 W. Va. 403, 19 S. E. 520; Manufacturing Co. v. Carroll, 30 W. Va. 532, 4 S. E. 782; West v. Ferguson, 16 Grat. 270; Styles v. Coal Co., 45 W. Va. 374, 32 S. E. 227.

It is unnecessary, to sustain this principle, to cite authorities from other states, as the principle is so well settled in our own state. It is a familiar rule that the courts of the United States, in construing the statutes of a state, will usually follow the courts of a state. If I follow the rulings of the courts of West Virginia as to the construction of the statute upon which the chancery proceeding in this cause was instituted, I must reach the conclusion that the sale under the decree of the court of McDowell county was void, and cannot be relied upon to devest the plaintiffs in this action of their legal rights in the 50,000 acres of land which that proceeding attempted to sell.

But before I pass from the discussion of the allegations of fraud in the bill, attacking the proceedings in the court of McDowell county (although no notice is taken by the counsel for the plaintiffs of the fact), I was struck with the discrepancy between the advertisement of the commissioner who advertised, under the decree of the court, the land as "a certain tract or parcel of land in the bill and proceedings mentioned, lying on Dry Fork and its tributaries, waters of Tug river, and near McDowell court house," and the deed made by the commissioner under the decree of the court, which deed gives the following description of the lands sold in pursuance of the decrees under which he was acting:

"The following real estate, situate in the county of Tazewell, Virginia, and McDowell county, West Virginia, the greater part in the latter, being the same land conveyed to I. P. Sperry and S. J. Ritchie by James S. French and wife, by deed bearing date the 27th day of March, 1871, and of record in the clerk's office of McDowell county court, in Deed Book No. 2, pages 26 and 27, being part of a survey of three hundred thousand acres patented to W. C. Nicholas, the portion herein conveyed being fifty thousand acres thereof; subject, however, to a reservation of six thousand acres heretofore conveyed by the said I. P. Sperry and S. J. Ritchie, eleven hundred acres of which was conveyed to Albert Rinear, eleven hundred to Alexander McConnell, and four thousand to Benjamin D. Wright; the said tract herein conveyed, subject to the reservations aforesaid, bounded and described as follows, to wit: * * *."

It will be perceived that the advertisement only speaks generally of "a tract of land lying on the Dry Fork and its tributaries, waters of Tug river, and near McDowell court house," stating the number of acres as 37,000 acres of valuable land in McDowell county; while the deed made by the commissioner, under the decree of the court, describes it as the land conveyed to Sperry and Ritchie by James S. French, and as a part of a survey of 300,000 acres patented to W. C. Nicholas, the portion conveyed being 50,000 acres. It is apparent to the mind of the court that the advertisement was deceptive in its character, and did not disclose truly the land that was to be sold. It did not state, as stated in the deed, that it was the land that had been conveyed by French and wife to Sperry and Ritchie on the 27th day of March, 1871, and of record in McDowell county, and that it was a part of a survey of 300,000 acres patented to Nicholas. If the advertisement had truly described the land as the land of the plaintiffs in this action, conveyed to them, possibly the plaintiffs might have been advised by some one as to the lands that were sold. Possibly they might have learned of it in some other way. The no-

tice is not a notice so open and notorious that the plaintiffs, who were interested in the land, if they had seen it, would have been put upon notice of the fact that it was their land against which the bill was filed, and upon which the proceedings were had to sell. I allude to this as a most remarkable fact, and one clearly indicating an effort upon the part of the plaintiff in the action to obtain a decree for the sale of land that he did not have the temerity to give a proper notice and advertisement of. These facts are apparent upon the face of the bill, which the court must consider upon this demurrer.

But it is claimed by the demurrants that the decree of the circuit court of McDowell county cannot be collaterally impeached, and for this reason the court is without jurisdiction in this case. I do not understand that this bill is filed merely for the purpose of impeaching the decree of the court, but it is more particularly filed for the purpose of attacking the two deeds of Sayers,—one made by the commissioner under the decree of the court, and the other the tax deed. The whole scheme and object of the bill is to attack those deeds, claiming that they are fraudulent and void, and for this reason it is not a collateral attack, but a direct effort upon the part of the plaintiffs in this action to vacate those deeds; but, even if it were an attack upon the proceedings of the court, "it is an axiom of the law that judgments entered without any jurisdiction are void, and will be so held in a collateral proceeding," as stated by the American and English Encyclopedia of Law (volume 12, p. 147); and this authority says that it is hornbook law, and cites a number of cases, both English and American, in support of this position.

In the case of Risley v. Bank, 83 N. Y. 318, the court held that where a court was authorized by a statute to entertain jurisdiction in a particular case only, and undertakes to exercise the power conferred in a case to which the statute has no application, it acquires no jurisdiction, and its judgment is a nullity, and will be so treated when it comes in question, and can be attacked either directly or collaterally.

In the case of Paul v. Willis, 69 Tex. 261, 7 S. W. 357, the court holds that a void judgment is always subject to collateral attack, and it can derive no legal sanction, even from the lapse of time. It would seem that, a court having no jurisdiction of the person or subject-matter of the person, any judgment rendered by it against either is void, and is a mere nullity, and will be so held in any court when it becomes material to the interests of the parties to consider it. But it may be claimed in this case that the court had a full and complete jurisdiction of the case. That may be conceded. But the question is, did it have jurisdiction to enter the particular decree and judgment thereon that it did enter? As we have before seen, we reach the conclusion that the particular judgment could not be entered; and it is a well-settled principle that, although a court may have jurisdiction of a case, yet, if it appears from the record that it did not have jurisdiction to enter the decree and the particular judgment thereon that it did enter, then that decree and judgment may be collaterally impeached. United States v. Walker, 109 U. S. 258, 3 Sup. Ct. 277, 27 L. Ed. 927; Ex parte Nielsen, 131 U. S.

176, 9 Sup. Ct. 672, 33 L. Ed. 118; Ex parte Cuddy, 131 U. S. 280, 9 Sup. Ct. 703, 33 L. Ed. 154; Lewis v. Allred, 57 Ala. 628; Folger v. Insurance Co., 99 Mass. 267; Fithian v. Monks, 43 Mo. 502; Seamster v. Blackstock, 83 Va. 232, 2 S. E. 36; Anthony v. Kasey, 83 Va. 338, 5 S. E. 176.

In the two cases cited and found in 131 U. S., 9 Sup. Ct., the supreme court held that, where a court is without authority to pass a particular sentence, such sentence is void, and the defendant imprisoned under it may be discharged on habeas corpus. Other authorities might be cited to sustain this position, but it is deemed unnecessary to do so.

For the reasons assigned, the court is of opinion that this court has a right to entertain this bill attacking directly the deed made in pursuance of the decree, and also attacking collaterally the decree made, as being a decree without authority of the court to enter. This court has repeatedly held that a bill may be filed to set aside a decree obtained by conspiracy and fraud. Such was the ruling in the case of Braxton v. Rich (C. C.) 47 Fed. 178; in the case of Wakeman v. Thompson, 32 W. Va. Append. p. 1, 40 Fed. 375; in the case of Lasher v. McCreery (C. C.) 66 Fed. 834; and in the case of Sayers v. Burkhardt, 29 C. C. A. 137, 85 Fed. 246,—all of which cases were disposed of by the court as now constituted, and every one of which, except the case of Wakeman v. Thompson, has been affirmed by the appellate court, there being no appeal in the latter case. In the view that I take of these questions, the demurrer attacking the jurisdiction of this court, for the reason that it cannot entertain a bill to set aside the judgment impeached in this bill, must be overruled.

This bill is objected to for the reason that it is an effort to litigate the rights of many parties who should not be made defendants to the bill. In many respects this case is somewhat similar to the case of Wakeman v. Thompson, which was passed upon by Justice Harlan, of the supreme court, and myself, constituting the court. In that case the lands were sold by proceedings in the circuit court of Boone county, and they passed into the hands of numerous parties, each claimant having derived his title, under the order of that court, to the lands in dispute, from a common source,—the purchaser at the tax sale. That was a case of delinquent lands that were sold for taxes. In this respect the two cases are similar. In this case, as in the case of Wakeman v. Thompson, the contention is that the sale by the sheriff for taxes was void, as not having fully complied with the provisions of the statute. Each defendant's title in this case depends upon the fact whether or not the sale made by the sheriff was in pursuance of the statute, and whether the former owners of these lands (the plaintiffs in this suit) became devested of their right and title to the land by reason of the proceedings in the tax sale. Every defendant in this case who claims any portion of this land, and whose title is derived from the purchasers under the decree of sale, or under the tax sale, is necessarily a party to this suit, because, as was held in Wakeman v. Thompson, one person having the same right against a number of persons may have that

right determined as to all the parties interested by one comprehensive suit; and for this reason the jurisdiction of a court of equity may be invoked, upon the familiar ground that by suing in equity, and bringing all the defendants who derive title from a common source before the court in one action, they can avoid a multiplicity of suits. In this case the bill seeks to set aside the tax sale for the same reasons that existed in the case of Wakeman v. Thompson. I do not propose at this time to review the decision in that case, but simply to say that this court holds that the rulings in that case are binding upon it, and that in the period of 10 years that has elapsed since the delivery of that opinion it has seen no cause to change its views upon the matters presented at that time for its consideration. In this case, as in that, it is alleged that the sheriff did not comply with the terms of the statute in making the sale. Upon the demurrer to this bill that allegation must be accepted as true. The court cannot at this time determine whether or not it is true. It is a matter of fact that does not appear upon the face of the deed, but can only be made to appear by other evidence, which necessarily involves an examination of the records of the county clerk's office, the sheriff's list of sales, and all the proceedings had in connection with the tax sale. The court does not perceive how, under an allegation of the character contained in the bill under consideration, which involves the illegal action of ministerial officers who pretended to act under the statute directing a sale of lands for taxes, and which action is sought to be impeached and invalidated, not only for a failure to comply with the statute under which the sale was made, but also for fraud, that the parties could have a full and complete remedy at law. Possibly a remedy at law against the purchaser at the tax sale might be maintained upon the mere question of whether or not the sheriff had complied with the terms of the statute in making the sale, but I do not understand, where a party may have a remedy at law, that he is required to elect to pursue that remedy, when he may also have a remedy in equity which would be more adequate to give him complete relief. Such was the ruling of the court in the case of Wakeman v. Thompson.

If the facts as alleged in this bill are true, in reference to the tax sale, that this sale was irregular, in not having complied with the statute; that there was a conspiracy upon the part of the parties who were the purchasers to have the lands sold and divided; that the conspirators after the sale and purchase divided the lands between them; and that the sale under the decree of the court, as well as the tax sale, was conceived and executed in fraud,—then the court is unable to perceive how a remedy at law could furnish adequate and full relief. This bill assails these transactions as illegal, fraudulent, and void.

In the case of Braxton v. Rich (C. C.) 47 Fed. 178, which was very elaborately discussed before the court as now constituted, the question arose as to the effect of a deed executed to a purchaser of lands purchased at a tax sale, founded upon a proceeding for which there was no authority of law. The court held, in an elaborate opinion, that a deed made in pursuance of such proceedings, to the purchaser

of the lands, or to another by his direction, or otherwise, was inoperative, null, and void for any and all purposes whatsoever, and the grantee in such deed acquired no right or title to the land which was purchased under an illegal sale, and cannot convey right or title to the lands therein mentioned to another, for the reason that every such deed, founded upon illegal proceedings leading up to its execution, is absolutely illegal, null, and void, and neither the purchaser nor those claiming under him could acquire any right or title to the land so purchased. That case was taken by an appeal to the supreme court of the United States, and in 158 U. S. 375, 15 Sup. Ct. 1006, 39 L. Ed. 1022, the supreme court affirmed the opinion of this court, and, after referring to many authorities, Justice Harlan, who delivered the opinion of the court, said:

"In the present case there are no defects of a controlling character that distinctly appear on the face of the tax deeds under which the defendants claim title; and as those deeds are made by statute prima facie evidence of title in the grantees named in them, and as, therefore, the plaintiffs, if sued in ejectment by the defendants, would be compelled, in order to defeat recovery against them, to resort to extrinsic evidence in support of their title, the deeds in question constitute a cloud upon that title, to remove which the plaintiffs may rightly invoke the aid of a court of equity."

It is insisted, under the fifth ground of demurrer, that relief cannot be granted against bona fide purchasers for a valuable consideration, but the relief must be a personal one against those who commit a fraud. I do not concur in this position, under the frame of this bill, nor do I think this is the proper time to raise that question. As it is a matter of fact, it cannot be raised upon a demurrer to the bill. It can only be raised upon the evidence taken in the case. Clearly, if the purchasers from Sayers were purchasers with notice of the fraud, the taint of fraud, when established by proof, would affect the title of all the purchasers who had notice of it.

It is also insisted under the third ground of demurrer that the will of Benjamin D. Wright, who was one of the owners of the land in controversy, was not properly probated in McDowell county, and for this reason that the title to his interest did not pass to the plaintiffs. The bill alleges that Wright died in 1894; that he was a citizen and inhabitant of the state of Ohio at the time of his death; and that he left a will, by which he devised his interest in those lands to his wife, which was duly probated, in the year 1894, in the probate court of Summit county, state of Ohio, and that a duly-authenticated copy was admitted to probate in the county clerk's office of McDowell county, in this state, on the 12th day of February, 1897. Under chapter 77, § 22, par. 4, Code W. Va., it is provided that where any person dies out of this state, having property within the state, and makes a will, "his will, or an authenticated copy thereof, may be admitted to probate in any county in this state where there is property devised or bequeathed thereby." This provision of the Code seems to answer the objection raised to the bill, because the bill charges that a duly-authenticated copy of that will was probated in the county of McDowell, in this state. It also alleges that the interest of Wright in the lands in controversy was devised to his wife, and that she conveyed whatever right she had

to the plaintiffs, being an undivided one-tenth of said lands, which had been previously conveyed to Wright in his lifetime. The facts stated in the bill must be accepted as true, upon demurrer, and the court at this time will not consider any legal question involving the right of the widow to convey her interest in the land, derived under the will of her deceased husband, before such will can be or is vacated or set aside by some legal proceeding. But I am inclined to think that the admission to probate of a will duly executed in another state, and probated in this state, under the provision of the Code referred to, should be regarded as a will of land in this state sufficient to pass title thereto.

As to the question of co-tenancy, the bill alleges that the lands in controversy, prior to the sale under the decree of the court and the tax sale, were not in the actual possession of any one, and that the owners of these lands, prior to that time, were tenants in common; that when the sale took place under the attachment proceedings, as well as the tax sale, Sayers became the purchaser of the lands; and that, if the court should be of the opinion that he had acquired title under the proceedings heretofore referred to, then he became a tenant in common with the plaintiffs in this action, and that no act of his, injurious, detrimental to, or claiming the lands adversely to his co-tenants under his purchase, would affect their rights, unless he brought home to them notice of his adverse claim and holdings; and for this reason the bill alleges that they are entitled, in the event the court should be of opinion not to set aside and cancel the deed under the attachment proceedings, as also the deed under the tax sale, to a partition of the lands in controversy, setting aside to the plaintiffs in severalty their portion of the land. This is a prayer for alternative relief. It is a well-settled principle in equity that a prayer for alternative relief may be granted, involving the same subject of litigation, where the relief as prayed for in the first instance is denied. It is a general principle of law that "if the plaintiff is in doubt whether, upon the case stated in the bill, he is entitled to one kind of relief or to another, he may frame the prayer for relief in the alternative, so that the court may grant the particular relief to which he is entitled upon the facts stated." 3 Enc. Pl. & Prac. p. 364, and the authorities there cited in the notes. "A bill may be framed with a double aspect, and pray for relief in the alternative, where the state of facts upon which relief is asked are not inconsistent." Guano Co. v. Heatherly, 38 W. Va. 410, 18 S. E. 611 (Syl., point 2). It seems to me that this principle is so familiar as not to require a further citation of authorities to sustain it.

The next objection to the bill is laches,—that the plaintiffs delayed too long before they commenced this suit. This is a question that should more particularly arise upon a careful examination of the facts in the case, to be disclosed by the testimony taken in it. I am now passing upon the demurrer to the bill, and the bill specifically alleges that the plaintiffs did not learn of the conspiracy and combination to deprive them of their lands until the summer of 1896. This allegation, taken in connection with the other allegations in

the bill in regard to the transactions of Harman,—who, as the bill alleges, had been acting as a quasi agent, if, in fact, not a real agent, of the plaintiffs in regard to these lands, and who, as the bill alleges, had brought the attachment suit to sell these lands after the taxes had been paid to him, and who seems to have purposely neglected and failed to notify the plaintiffs in this cause as to the condition and situation of the lands, the plaintiffs in the meantime reposing confidence in him, being lulled into security and having no occasion to watch the records or to distrust his fidelity to their interests,— are questions of fact, to be considered upon the final hearing of the case upon its merits. The bill alleges and fixes the time when the plaintiffs discovered the facts which they think entitled them to recover the lands in controversy, and that, shortly after the discovery of them, they took all the steps that were necessary to institute legal proceedings. It is apparent upon the face of the bill that the statute of limitations does not run, and by analogy a court of equity would hardly determine that a party was guilty of laches within the period that the statute of limitations would not defeat a recovery for land upon the legal title.

In a well-considered opinion of this court in the case of Halstead v. Grinnan, 152 U. S. 412, 14 Sup. Ct. 641, 38 L. Ed. 495, it was held that "there can be no laches in failing to assert rights of which a party is wholly ignorant, and whose existence he had no reason to apprehend"; and the supreme court of the United States approved of the ruling in that case, and held that "the length of time during which a party neglects an assertion of his rights, which must pass in order to show laches, varies with the peculiar circumstances of each case, and is not subject to an arbitrary rule."

In the case of Lasher v. McCreery (C. C.) 66 Fed. 834,—a case that was heard before the circuit judge and myself, and in which I wrote the opinion of the court,—it was held that, laches being an equitable defense, it will not be allowed to deprive a rightful owner of his land, unless the principles of equity require it to be done, and that "laches cannot be imputed to one who was ignorant of his rights, and for that reason failed to assert them"; and this case was affirmed by the appellate court. In the case of Sayers v. Burkhardt, this same question was again presented to the consideration of this court, and the court adhered to the same ruling as in the cases just cited. 29 C. C. A. 137, 85 Fed. 246. In the case of Cook v. Lasher the court held that the "delay of a landowner in bringing suit to annul a tax deed, which is utterly void for failure to comply with the requirements of the statute, and which consequently does not affect his title, is not imputable to him as laches." 19 C. C. A. 654, 73 Fed. 701.

The allegations of this bill are sufficient, upon a demurrer, to entitle the plaintiffs to a hearing upon the questions presented, and, as the court has said, in every case in which laches are imputed to a party who seeks to recover land, it must be decided and controlled by the facts and circumstances which surround the particular transaction. There can be no fixed and definite rule to govern and control this question of law.

I have given the questions arising upon this demurrer much thought and reflection. There are some minor points raised by the demurrer that I have not noticed, for the reason that the questions considered dispose of the demurrer. The bill is a very elaborate one, and presents many phases of interesting questions, which have been very ably presented by counsel on both sides; but upon a full consideration of all the points raised by the demurrer to the bill, and for the reasons assigned, I reach the conclusion to overrule the demurrer.